UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PHYLLIS HANNAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:13CV00053 ERW |
| | ) | |
| AUTO-OWNERS INSURANCE COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

This matter comes before the Court on "Defendant's Motion in Limine Regarding Actual Cash Value and Replacement Cost" [ECF No. 42], "Defendant's Motion in Limine to Exclude Expert Testimony of Eric Baker" [ECF No. 43], "Defendant's Motions in Limine" [ECF No. 44], and "Plaintiff's Motions in Limine" [ECF No. 45].

Plaintiff Phyllis Hannan ("Plaintiff") filed a "Petition for Recovery Under a Property Insurance Policy" in the Circuit Court of Montgomery County, Missouri, on May 14, 2013, asserting claims for breach of contract and vexatious refusal to pay [ECF Nos. 1-1, 6]. On June 6, 2013, Defendant Auto-Owners Insurance Company ("Auto-Owners") filed a Notice of Removal, removing the cause to this Court on the basis of diversity jurisdiction, pursuant to 28 U.S.C. §§ 1332 and 1446 [ECF No. 1]. Auto-Owners filed its Answer to Plaintiff's Complaint on that same date, asserting the following affirmative defenses: 1) failure to state a claim upon which relief may be granted; 2) no coverage and bar from recovery, per terms of policy, for failure and refusal to allow Auto-Owners to inspect her roof; 3) no coverage and bar from recovery, per terms of policy, because damage to property was due to wear and tear,

deterioration, or hidden or latent defects; 4) no coverage and bar from recovery, per terms of policy, because the damage to property was due to faulty, inadequate or defective design, workmanship, repair, construction, renovation, remodeling, maintenance, or was due to faulty, inadequate or defective materials used in repair, construction, renovation or remodeling; and 5) no coverage and bar from recovery, per terms of policy, because the damage claimed to the interior of the building was not a result of a covered cause of loss (citing specifically to an exclusion for interior damage resulting from, inter alia, rain, unless the building first sustained damage by a Covered Cause through which rain entered) [ECF No. 5].

The parties' good faith Alternative Dispute Resolution participation did not achieve a settlement [ECF No. 14]. Subsequently, the Court granted Auto-Owners leave to amend its Answer as to affirmative defenses, on the basis of information learned in Plaintiff's expert deposition [ECF Nos. 15-16].

Auto-Owners filed its Amended Answer on February 27, 2014, asserting the following affirmative defenses: 1) failure to state a claim upon which relief may be granted; 2) no coverage and bar from recovery, per terms of policy, for failure and refusal to allow Auto-Owners to inspect her roof; 3) no coverage and bar from recovery, per terms of policy, because damage to property was not caused by windstorm or hail, and as such, was not caused by a covered cause of loss under the policy; 4) no coverage and bar from recovery under policy of insurance because the damage claimed to the interior of the building was not a result of a covered cause of loss (citing Covered Causes of Loss clause definition for Windstorm or Hail, excluding coverage for interior damage caused by rain unless building first sustained wind or hail damages to the roof through which rain entered); 5) no entitlement to coverage under policy of insurance, because the cause of the alleged damage does not fall within the policy's

specifically enumerated perils (fire; lightening; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; sprinkler leakage; sinkhole collapse; volcanic action; breakage of glass; falling objects; weight of snow, ice or sleet; and water damage, meaning accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam, other than an Automatic Sprinkler System); 6) no coverage and bar from recovery, as loss specifically excluded per policy terms, because the damage to property was due to surface water or water that backs up from a sewer or drain; and 7) no coverage and bar from recovery as loss specifically excluded per policy terms, because the damage to property was due to "fungi," wet rot, dry rot and bacteria [ECF No. 17].

Plaintiff and Auto-Owners have submitted a joint Stipulation of Uncontested Facts [ECF No. 24]. As pertinent to the parties' motions in limine, the parties agree the following facts are uncontested. Auto-Owners issued a policy of insurance (bearing Policy No. 114605-75006856-11; hereinafter referred to as "Policy") to Plaintiff on property located at 680 S. Sturgeon Street, Montgomery City, Missouri 63361, for the period of November 11, 2011, through November 11, 2012. Plaintiff made a claim under her Policy for damage arising out of a July 2, 2012 storm.

After investigation into the claim, Auto-Owners determined the storm damage was Seventeen Thousand, Five Hundred, Sixty-Seven Dollars and Twenty-Five Cents ($17, 567.25). Auto-Owners applied a Five Thousand Dollars and No Cents ($5,000.00) deductible to Plaintiff's claim, and then issued a check for Twelve Thousand, Five Hundred, Sixty-Seven Dollars and Twenty-Five Cents ($12,567.25) on July 25, 2012 (with American Bank of Missouri named as mortgagee), and on August 14, 2012 (with People's Savings Bank named as mortgagee).

After the payment of the claim, Plaintiff filed a second notice of loss with Auto-Owners on September 11, 2011, claiming additional damage relating to the July 2, 2012 storm. Auto-Owners investigated the claim presented by Plaintiff. Based on its investigation, Auto-Owners has refused to pay any additional monies, as it is the company's position that the damage alleged by Plaintiff is not related to the July 2, 2012 storm.

Plaintiff claims there is additional damage to her roof due to the July 2, 2012 storm, and contends she is entitled to recover additional insurance proceeds under the Policy. Plaintiff also contends Auto-Owner's refusal to pay her claim is without reasonable cause or excuse and she asserts she is entitled to recover an additional statutory penalty as a result.

On July 23, 2014, the Court conducted a pretrial conference to hear arguments of the parties' pretrial motions [ECF No. 55]. At the conclusion of the proceedings, the Court took the motions under submission. After review of the parties' motions, supporting exhibits and memoranda, and consideration of the parties' arguments, the Court rules as follows.

## I. PLAINTIFF'S MOTIONS IN LIMINE [ECF NO. 45]

In her Motions in Limine, Plaintiff asks the Court to enter an Order instructing Auto-Owners "to refrain from mentioning or interrogating directly or indirectly in any manner whatsoever, including the offering of documentary evidence during voir dire, opening statements, direct or cross-examination, closing arguments, or otherwise providing to the jury regarding the following matters:" 1) affirmative defenses asserted in Auto-Owners's Amended Answer that were not included in Auto-Owner's October 29, 2012 denial letter; and 2) "Exclusions" contained within the Policy's "Causes of Loss – Special Form (54082) [see ECF No. 45-1 at 8-9]. Auto-Owners has filed its "Objection to Plaintiff's Motion in Limine" [ECF No. 49].

Plaintiff claims Auto-Owners amended its Answer to include a number of affirmative defenses that were not present in any previous denial of benefits by Auto-Owners, and contends Missouri case law clearly prohibits "such retrospective supplementation" by an insurer denying benefits under a policy of insurance. As to Plaintiff's Motion in Limine to exclude certain affirmative defenses, Auto-Owners contends the motion is an improper, untimely motion to strike

In Missouri, the general rule is that "an insurer, having denied liability on a specified ground, may not thereafter deny liability on a different ground." *Brown v. State Farm Mut. Auto. Ins. Co.*, 776 S.W.2d 384, 386 (Mo. 1989). In *Brown*, the Missouri Supreme Court granted transfer "to consider whether an insured must show prejudice from asserting a subsequently offered, more specific defense." *Id.* Before reaching its conclusion, the *Brown* court examined the doctrines of waiver and estoppel, noting confusion between cases employing the different legal doctrines. *Id.* at 386-89. The court noted estoppel requires "(1) an admission, statement or act inconsistent with the claim afterwards asserted and sued upon, (2) action by the other party on the faith of such admission, statement or act, and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement or act." *Id.* at 388. Waiver is "the voluntary relinquishment of the right to rely on the contractual provision which forms the basis of waiver[";] accordingly, the Court found this defense did not require a showing of prejudice to an insured. *Id.* at 388.

However, the court's examination of case law led it to adopt a preference as to the doctrine of estoppel: "[I]n the absence of either (1) an express waiver by the insurer or (2) conduct which clearly and unequivocally shows a purpose by the insurer to relinquish a contractual right, the insured must show prejudice before the rule may be invoked."

In an October 29, 2012 letter denying Plaintiff's claim for additional damages caused by roof leaking, Auto-Owners stated that the damage to Plaintiff's property was determined to be:

> due to faulty or inadequate construction or maintenance. It appears the installation of the EPDM roof membrane over the prior roofing system and the possibility of improper installation of this roof, prevented proper attachment and probably affected the slope of the roof. As the damage that occurred from the 7-2-2-12 claim was repaired and there was no other covered damage found to the roof, we regretfully deny your claim for the replacement of the roof.
>
> The determination that there is no coverage for the claim submitted is based on our investigation, the policy(ies) identified and information provided.

[ECF No. 45-1 at 10].

When Auto-Owners filed its original Answer to Plaintiff's Complaint, it asserted affirmative defenses that were consistent with the reason stated for its loss determination in the October 29, 2012 denial letter. An examination of Auto-Owners's Amended Answer reveals that several of Auto-Owners's asserted defenses are likewise consistent with the denial letter. However, the Court finds that Auto-Owners's sixth and seventh affirmative defenses raise entirely new grounds for its refusal to pay Plaintiff's claim. The Court finds no waiver by Auto-Owners; however, the Court concludes these defenses are inconsistent with the specific defense announced in the denial letter. Nevertheless, Plaintiff has not shown the required prejudice before estoppel may be invoked. Accordingly, the Court will deny Plaintiff's request to exclude affirmative defenses asserted in Auto-Owners's Amended Answer that were not included in Auto-Owners's October 29, 2012 denial letter.

Plaintiff also contends the doctrines of estoppel and waiver preclude Auto-Owners from enforcing the "Exclusions" clause contained in the Policy's "Causes of Loss – Special Form (54082), because Auto-Owners considered her roof to be in "good" and insurable shape during the Policy's effective dates, November 11, 2011 through November 11, 2012.

For its Objection, Auto-Owners also claims it had no duty to re-inspect the roof after it issued the Policy, and it asserts any failure to inspect the roof would not waive any coverage or defenses. Auto-Owners further states Plaintiff's waiver argument has not been properly pleaded. Auto-Owners claims Plaintiff's first notice that she was going to assert waiver was in her Trial Brief, submitted only twenty days prior to the scheduled trial date. Auto-Owners claims Plaintiff has improperly raised this issue on the eve of trial, causing it severe prejudice. Auto-Owners further argues any use of the waiver defense in this situation would be improper under Missouri law, as Plaintiff is attempting to rewrite the policy of insurance, and to create coverage where none previously existed. Auto-Owners contends that, even if such defenses were proper, these defenses would not apply under the facts of this matter. In its Objection, Auto-Owners states that it is not relying on wear and tear or faulty construction exclusion, and the only policy provision at issue is the following:

> When Broad is shown in the Declarations, Covered Causes of Loss means the following:
> * * *
> 4. Windstorm or Hail, but not including:
>
> c. Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, sand or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damages to its roof or walls through which rain, snow, sand or dust enters.

[ECF No. 49 at 3]. As indicated in the Court's discussion of Plaintiff's first point, this affirmative defense is consistent with the reason Auto-Owners stated for denying Plaintiff's claim in its October 29, 2012 letter, i.e., there was no other covered damage found to the roof. The Court will deny Plaintiff's request to exclude "Exclusions" contained within the Policy's "Causes of Loss – Special Form (54082).

## II. DEFENDANT'S MOTION IN LIMINE REGARDING ACTUAL CASH VALUE AND REPLACEMENT COST [ECF NO. 42]

During the pretrial conference, Auto-Owners asserted Plaintiff's Policy is an Actual Cash Value policy, thus contending Actual Cash Value is the proper measure of damages in this action. In its Motion in Limine regarding Actual Cash Value and Replacement Cost, Auto-Owners asks the Court to exclude evidence of fair market. or actual cash value of the Property that was not disclosed in Plaintiff's discovery answers or deposition testimony. Auto-Owners claims it has made significant efforts to discover Plaintiff's position on the difference in fair market value before and after the loss, but Plaintiff failed to produce any evidence with regard to the fair market value or actual cash value of the property after the storm. Auto-Owners claims introduction of any "after" number would constitute unfair surprise and severely prejudice Defendant.

Auto-Owners's argument is persuasive. Plaintiff has produced no evidence of fair market value or actual value of the property after the storm. Plaintiff has stated under oath in a deposition that she does not know the after-storm value of the property. She confirmed in an interrogatory answer that no appraisal was performed post storm.

Plaintiff filed a Memorandum in Opposition to Defendant's Motion in Limine Regarding Actual Cash Value and Replacement Cost [ECF No. 51]. Plaintiff claims the proper valuation of her loss is Replacement Cost Value. She contends Auto-Owners has "waived" and should be "estopped" from asserting the Policy is an Actual Cash Value policy, because both parties have always treated it as a Replacement Cost Value policy. Plaintiff relies on the "Loss Report and Repair Estimate" prepared by a claims adjuster who listed "RCV" and ACV" as the same figure, $17, 567.25. Plaintiff asserts Auto-Owners paid the July 2, 2012 claimed loss for "covered wind damage" in an amount equal to its valuation of Replacement Cost Value, with no reduction for

depreciation. Plaintiff claims, as a result of Auto-Owners's treatment of the Policy as a Replacement Cost Value policy, she continued paying premiums and maintained her insurance on the property with Auto-Owners. Plaintiff also claims Auto-Owners's corporate designee, Joe Jackson, made an admission that the Policy was a Replacement Cost Policy, when he noted in his deposition that Plaintiff's policy was not renewed because "of the value," stating 'the building was not insured to value," and ". . . if you want replacement cost on your building and not have a co-insurance penalty, we want you to have your building insured to within a certain limit in order to hopefully not to have a co-insurance penalty at the time of the claim."

Plaintiff's Policy includes a "Loss Payment" clause, containing the following language:

In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1)   Pay the value of loss or damaged property;

(2)   Pay the cost of repairing or replacing the lost or damaged property;

(3)   Take all or any part of the property at an agreed or appraised value; or

(4)   Repair, rebuild or replace the property with other property of like kind and quality.

[ECF No. 1-1 at 18]. The Policy's "Valuation" clause states:

We will determine the value of Covered Property in the event of loss or damage as follows:

a.   At actual cash value as of the time of loss or damage, except as provided in b., c., d., and f. below.

[ECF No. 1-1 at 19]. The circumstances of Plaintiff's claim do not appear otherwise to fall within the Policy's listed exceptions for Actual Cash Value Valuation. The Policy does not provide a definition for "Actual Cash Value," or "Replacement Cost Value."

Where a policy definition for "Actual Cash Value" is not provided, Missouri courts

substitute a common law definition. "Under Missouri law, actual cash value is defined as the difference between the reasonable value of the property immediately before and after the loss." *Harris v. Am. Modern Home Ins. Co.*, 571 F.Supp.2d 1066, 1079 (E.D. Mo. May 30, 2008)(citing *Porter v. Shelter Mut. Ins. Co.*, 242 S.W.3d 385, 387 n. 2, 390 (Mo. Ct. App. 2007). "The phrase 'actual cash value' has been treated by Missouri case law as meaning 'fair market value[,]' . . . 'the price the property would bring if sold by a willing seller to a willing buyer who is under no compulsion to buy.'" *Garvin v. Acuity*, No. 11-05105, 2012 WL 5197223 at *4 (W.D. Mo. Oct. 19, 2012)(quoting *Warren Davis Props. B. L.L.C. v. United Fire & Cas. Co.*, 4 S.W.3d 167, 173 (Mo. App. 1999). "Actual cash value is the replacement cost value minus normal depreciation, or fair market value, while replacement cost value represents the cost of replacing an item with a new one of like kind." *Santizo v. Allstate Prop. & Cas. Ins. Co.*, No. 09-151, 2010 WL 2735649 (E.D. Mo. July 9, 2010). It is incumbent on Plaintiff to introduce evidence showing the market value of the property immediately before and immediately after the storm damage claimed by Plaintiff. Plaintiff has supplied Auto-Owners with evidence of the reasonable value of her property prior to the claim loss, but, she has only produced evidence as to the actual cost of the repairs after the damage occurred. Such evidence is properly considered, but not conclusive, of the property's post-loss value. *See Brown v. Pennsylvania Fire ins. Co., Phila.,*, 263 S.W.2d 893, 899 (Mo. Ct. App. 1954). Considering that Plaintiff's evidence of cost of repair cannot be said to be comparatively insignificant as compared to Plaintiff's evidence of the value of the property as a whole, her sole reliance on evidence of repair costs carries a risk of insufficient evidence on which to instruct on the measure of damages. *Id.* at 900.

Auto-Owners also contends any evidence of replacement cost should be excluded as not relevant. During the pretrial conference, the Court received copies of a Loss Report and a repair

estimate prepared by Wickizer & Clutter, Inc., concerning Plaintiff's July 2, 2012 claim. The Loss Report indicates that inspection of Plaintiff's roof revealed wind damage to the rubber roofing in a 35'x115' area, which could be "spot repaired." The report also notes the fiberboard insulation in this area needed to be replaced, because it had gotten wet. The Loss Report indicates photographs and a repair estimate were submitted with the report. The repair estimate concerned only the 35'x115' area, and derived the cost of repair by multiplying the quantity of materials and labor hours required by their unit cost. These values were listed in a column labeled "RCV." The repair estimate included columns labeled "Deprec." and "ACV." No reduction for depreciation was indicated. The values listed in the "RCV" column were carried over and listed under the "ACV" column. In its "Summary for Building" section, the report indicated the "Line Item Total" was $17, 115.04, the "Material Sales Tax" was $ 452.21, and the "Replacement Cost Value" was $17, 567.25. After allowing for a $5,000 "Deductible," the" Net Claim" was reported as $12,567.25.

Basically, Plaintiff's argument appears to be that Auto-Owners, having decided her event was compensable, elected to pay her loss claim for the July 2, 2012 storm damage at Replacement Cost Value without reduction for depreciation, thus waiving any right to object to the admission of Replacement Cost Value evidence. During the pretrial proceedings, Auto-Owners contended the language contained in the repair estimate does not indicate such an election was made by Auto-Owners. Auto-Owners argued that the repair estimate was prepared by an underwriter and does not constitute an election by Auto-Owners to compensate Plaintiff's loss at Replacement Cost Value. The Court finds Auto-Owners elected, after determining Plaintiff's July 2, 2012 claim was a covered event of loss, to pay the cost of repairing Plaintiff's damaged property, in accordance with subsection a.(2) of the Policy's Loss Payment clause.

Auto-Owner's choice of this option makes such evidence relevant. The Court will deny Auto-Owner's request to exclude any evidence of replacement cost.

### III. DEFENDANT'S *DAUBERT* MOTION: DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF ERIC BAKER [ECF NO. 43]

Plaintiff identified Eric Baker as an expert in her Rule 26(A)(2)(C) Expert Disclosure, and indicated that the subject matter of his testimony would be causation of loss and estimates for repair or replacement [ECF No. 43-1]. In the Preliminary Findings section of the Report produced by Plaintiff to Auto-Owners, Mr. Baker reported: "Damage to the EPDM membrane the underlying insulation and damage to the metal roof & metal siding was observed as the result of wind/hail storm related events." Mr. Baker set forth the following conclusions in his Report:

> The force of the storm caused a large 30'x100' area of membrane to bec[o]me detached from its mechanical fasteners and actively billow EPDM allowing an internal pressure build-up and water infiltration to the insulation board. The active billowing and internal pressure with the lift force of the storm winds caused the EPDM layer to stretch and rupture in multiple locations. Ruptures exhibit bubbling of entrapped moisture.
>
> Hail strikes crushed the moisture saturated roof insulation and the insulation is distorting in multiple areas, and per manufacture specification insulation must be replaced. Hail strikes also damage[d] some of the EPDM mechanical fasteners, and hail damaged the metal roofing and siding.
>
> Restoration is not a feasible alternative at this point as the damage to the insulation board requires a complete removal of all roofing material and as the EPDM has multiple ruptures it is not re-installable.
>
> As this is a box recycling business the water penetration damages the inventory, thus this threatens the lease income from this property.

[ECF No. 43-2 at 1].

In the Report's Summary, Mr. Baker opined that a replacement cost policy allows for the possibility that an insured would be placed in a better position than the insured was in before a loss, because such policies are intended to allow the insured to replace a damaged building [ECF

No. 43-2 at 2]. Mr. Baker further stated: "To simply restore a roof to its pre-damaged condition may render it unfit for similar use if the substrate or deck is deteriorated and insufficient to support a layer of new roof materials or does not meet the manufacture[r's] specifications."[1]

Federal Rule of Evidence 702 sets forth the standards for determining if expert opinion testimony is admissible:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert=s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Thus, to be admissible, evidence must be useful to the fact finder in deciding the ultimate issue of fact, the witness must be qualified to assist the fact finder, and the evidence must be reliable or trustworthy in an evidentiary sense. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)). Proponents of expert testimony must prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky

---

[1] While the issue of Mr. Baker's expertise in interpreting insurance policies was not argued, the Court cautions Plaintiff's counsel not to raise these issues in opening statement, nor adduce evidence from Mr. Baker on these subjects without first stating to the Court, out of the hearing of the jury, his intention to do so. It is the Court's view this is a matter of law to be decided by the court and there is no showing this witness is an expert in interpreting insurance policies.

but admissible expert evidence. *Daubert*, 509 U.S.. at 596. However, an expert=s opinion should be excluded when it is Aso fundamentally unreliable that it can offer no assistance to the jury.@ *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004).

In its Motion in Limine to Exclude Expert Testimony of Eric Baker, Auto-Owners contends Mr. Baker's opinion testimony, regarding 1) the issues of damages caused to Plaintiff's mechanically fastened EPDM roof, office, and metal roof, and 2) Auto-Owner's claim handling practices, is unreliable, and lacks sufficient foundation to be admissible as expert testimony [ECF No. 43 at 2]. Auto-Owners claims:

> [Mr. Baker's] background and lack of knowledge, skill, experience, training, and education with mechanically fastened EPDM roofs and related storm damage prohibits him from knowing what caused damage to Plaintiff's roof. Additionally, Mr. Baker's testimony regarding the damages caused to Plaintiff's mechanically fastened EPDM roof, office, and metal roof fails to consider relevant facts and reliable methodologies, sources, and theories. Finally, Mr. Baker's opinion testimony on Auto-Owner]'s] claim handling practices should be excluded because Plaintiff does not meet the disclosure requirements of Rule 26(a)(2) and Mr. Baker's testimony is based on insufficient facts, knowledge, skill, experience, training, and education.

[ECF No. 43 at 2}.

In "Plaintiff's Memorandum in Opposition to Defendant's Motion in Limine Regarding Eric Baker Expert Testimony," Plaintiff claims Mr. Baker's construction experience, particularly his work on commercial roofs and estimating work on EPDM roofs, properly qualifies him as an expert to address causation and estimating the pricing of the work required to replace or repair damage to Plaintiff's commercial property resulting from the summer 2012 storm, or storms [ECF No. 52]. The Court notes that, during the pretrial conference, Auto-Owners stated that its Motion in Limine to Exclude Expert Testimony of Eric Baker was limited to that part of Mr. Baker's report pertaining to causation of damages. Auto-Owners indicated that it did not object to Mr. Baker's damage repair estimation and was not asking the Court to exclude that evidence.

Accordingly, the following analysis regarding the admissibility of Mr. Baker's expert report concerns only that part pertaining to causation, and does not apply to Mr. Baker's repair estimation.

In determining whether expert testimony should be presented to a jury, Courts consider several factors, including: 1) whether the theory or technique can be, and has been, tested; 2) whether the theory has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the theory or technique is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593-94. Other factors useful for screening expert testimony for relevance and reliability include whether: 1) the expertise was developed solely for litigation or naturally flowed from the expert's research; 2) the expert ruled out alternative explanations; and 3) the expert sufficiently connected the proposed testimony with the facts of the plaintiff's case. *Lauzon*, 270 F.3d at 687.

The transcript of Mr. Baker's deposition casts significant doubt on the reliability, in the evidentiary sense, of his expert opinion testimony regarding the cause of damaged to Plaintiff's mechanically fastened EPDM roof. The Court notes that Mr. Baker had never seen a mechanically-fastened EPDM roof prior to observing Plaintiff's roof [ECF No. 43-3 at 30, 39]. Mr. Baker's lack of experience with mechanically fastened EPDM roofs arguably makes his qualification, to offer an expert opinion regarding Plaintiff's damages in this matter, subject to challenge on cross-examination. Nevertheless, this inexperience is not determinative on the issue of the testimony's admissibility. However, the insufficiency of the facts or data used as the basis for his opinion, the methodology employed by Mr. Baker in analyzing the information he obtained by visual inspection of the roof, and the scientific basis, if any, for his analysis, cause his opinion testimony regarding causation to be unreliable.

During his deposition, Mr. Baker testified that he did not know the age of Plaintiff's roof, he did not observe how the EPDM's plastic washer fasteners were attached to the roof, he did not know the composition or placement of the fasteners, and he did not know how the roof system was supposed to be installed [ECF Nos. 43-3 at 28-30, 32-33, 69]. He further testified that he did not know why this particular roof system was no longer installed [ECF No. 43-3 at 31]. Although Mr. Baker stated that shrinkage and contraction of EPDM material with the change of seasons makes the material more brittle over time, he conceded he did not know over what length of time such deterioration occurred [ECF No. 43-3 at 32]. Mr. Baker testified that he performed a visual inspection of the roof after it had been repaired, and had no way to observe what had actually happened under the roof; he said he did not know what was below the EPDM, and did not procure any core samples of the roof [ECF No. 43-3 at 36-37, 91]. When asked if he relied on any document in forming his opinion, Mr. Baker responded he formulated his opinion solely on the basis of his visual inspection of the roof [ECF No. 57].

Mr. Baker further testified that he had not visited Plaintiff's building prior to the July 2, 2102 storm, and did not know its condition prior to that date [ECF No. 43-3 at 68]. He stated his knowledge regarding its condition prior to July 2, 2012 was derived from statements his company received from "anybody else" [ECF No. 43-3 at 68]. He testified he did not know if any interior water damage occurred prior to July 2, 2012, did not know what storm or hail damage may have occurred previously, and did not know what repairs had been made to the roof prior to that date [ECF No. 43-3 at 68]. He conceded he did not know whether the hail marks on the roof were from the July 2, 2012 storm, explaining, "Well, you can never tell how old a hail, a hail hit is."

When asked about the data that suggested a hail storm occurred on July 2, 2012, Mr.

Baker was unable to identify what storm reports he used [ECF No. 43-3 at 71]. He stated he interviewed some of the individuals who were in the building during the storm, but he did not record any of the conversations and could not remember the names of the people he questioned [ECF No. 43-3 at 73]. Mr. Baker testified he had read articles about "billowing and EPDM roofs," but could not recall what articles he read, and could not recall the source upon which he based his billowing theory [ECF No. 43-3 at 80-85]. When asked about his "bubbling of entrapped moisture" theory, Mr. Baker could not recall the basis for the theory, stating,. "I would say it probably came from Hague" [ECF No. 43-3 at 99].

Although the Court recognizes that an expert might form a conclusion based on a visual or tactile inspection, and that such a method of analysis can be reliable, the record in this matter does not support a finding that Mr. Baker has sufficient specialized knowledge to assist a juror in deciding the particular issues in this matter. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999). There is no indication in the record that other experts in the industry endorse his billowing and bubbling of entrapped moisture theories, and no identified reference to articles or papers that validate his conclusions. *Id.* Most troubling, however, is insufficiency of the factual basis upon which Mr. Baker's report is based. In light of the record as developed by the parties, the Court finds that Mr. Baker's opinion testimony on the cause of damage to the roof must be excluded.

IV. **DEFENDANT'S MOTIONS IN LIMINE [ECF No. 44]**

In its Motions in Limine, Auto-Owners requests that the Court enter Orders excluding any reference to, or evidence of: 1) other claims and lawsuits involving Auto-Owner's handling or denial of unrelated first-party insurance claims presented to Auto-Owners by other individuals (particularly, any testimony from Plaintiff's insurance broker, Michael Granneman, regarding his

opinion on the handling of unrelated claims with Auto-Owners); 2) statements allegedly made by Auto-Owners, its employees, or its agents that were not set forth in Plaintiff's responses to interrogatories and production requests; 3) Plaintiff's character or character traits to support an inference she has a reputation for truthfulness; 4) Plaintiff's payment and amount of premium; 5) argument suggesting jurors should consider what they would like or expect their insurance company to do if they were in Plaintiff's position; 6) argument directly or indirectly comparing the size, power, and wealth of Plaintiff and Auto-Owners; 7) argument about the insurance industry in general, and what insurance companies do; 8) other objectionable statements and arguments regarding insurance company's collection of premiums and refusal to pay claims or defend insureds; 9) argument or inference, direct or indirect, suggesting an insurance company can hire an expert to say anything; 10) Auto-Owners's alleged vexatious refusal to pay not disclosed in Plaintiff's answers to interrogatories; 11) the propriety or depth of Auto-Owners's claim investigation, any alleged violation of company policies and procedures, any alleged violations of state statutes or regulations, and any alleged delay in the handling of the claim that have not been the facts pleaded in Plaintiff's interrogatory answer; 12) the defense of waiver; 13) Auto-Owners's failure to inspect Plaintiff's roof during the period between issuance of the Policy and Plaintiff's alleged loss; 14) settlement negotiations and Auto-Owners's offer during mediation; and 15) cancellation of Plaintiff's Policy, or any claim there should be coverage for any damage outside the policy period [ECF No. 44].

In her memorandum opposing Auto-Owners's Motion in Limine, Plaintiff raised objections only as to those involving Plaintiff's asserted waiver defense, and Auto-Owners's failure to inspect Plaintiff's roof during the period between issuance of the Policy and Plaintiff's alleged loss [ECF No. 53]. During the pretrial conference, the Court inquired to determine the

parties' positions on each type of evidence Auto-Owners's seeks to exclude, and the parties' responses indicated their agreement on the use of many of those listed.

Accordingly, the Court will grant Auto-Owners's motion to exclude evidence as to following:  1) other claims and lawsuits involving Auto-Owners's handling or denial of unrelated first-party insurance claims presented to Auto-Owners by other individuals (particularly, any testimony from Plaintiff's insurance broker, Michael Granneman, regarding his opinion on the handling of unrelated claims with Auto-Owners); 2) Plaintiff's character or character traits to support an inference she has a reputation for truthfulness; 3) argument suggesting jurors should consider what they would like or expect their insurance company to do if they were in Plaintiff's position; 4) argument directly or indirectly comparing the size, power, and wealth of Plaintiff and Auto-Owners; 5) argument about the insurance industry in general, and what insurance companies do; 6) argument or inference, direct or indirect, suggesting an insurance company can hire an expert to say anything; and 7) settlement negotiations and Auto-Owners's offer during mediation.

As to Auto-Owners's request that other objectionable statements and arguments regarding insurance company's collection of premiums and refusal to pay claims or defend insureds be excluded, Plaintiff indicated she might tender evidence regarding Auto-Owners's collection of premiums and refusal to pay claims in this matter, to support her vexatious refusal-to-pay claim.  Plaintiff stated she did not, however, intend to offer objectionable statements about such conduct among insurance companies generally.  Accordingly, the Court will deny Auto-Owners's motion to exclude this evidence, in accordance with Plaintiff's representation. The remaining requests presented in Auto-Owners's Motion in Limine are also denied; however, Auto-Owners may renew its objections at trial.

Accordingly,

**IT IS HEREBY ORDERED** that "Plaintiff's Motions in Limine [ECF No. 45] are **DENIED.**

**IT IS FURTHER ORDERED** that "Defendant's Motion in Limine Regarding Actual Cash Value and Replacement Cost" [ECF No. 42] is **GRANTED in part,** and **DENIED in part**. Defendant's Motion in Limine will be granted to the extent Plaintiff will be permitted to state in opening statement and to adduce evidence of her property's actual cash or fair market value before the storm. She will not be permitted to state in opening statement or adduce evidence of her property's actual cash or fair market value after the storm that is inconsistent with her discovery responses. In all other respects, Defendant's motion will be denied.

**IT IS FURTHER ORDERED** that "Defendant's Motion in Limine to Exclude Expert Testimony of Eric Baker" [ECF No. 43] is **GRANTED**.

**IT IS FURTHER ORDERED** that "Defendant's Motions in Limine" [ECF No. 44] is **GRANTED in part,** and **DENIED in part,** as discussed in the Court's above analysis.

So Ordered this 25th day of July, 2014.

                                                **E. RICHARD WEBBER**
                                                **SENIOR UNITED STATES DISTRICT JUDGE**